We are here this morning to hear the case of Jane Doe No. 55 v. Madison Metropolitan School District, and we are ready to hear from Mr. Herman, if you are ready. Good morning. May it please the Court, it really is my privilege to be here this morning before this panel to talk about what I think is a very important and timely case. At its core, this case is about how far we are going to let a man touch a schoolgirl in the 21st century. In this Title IX case, the key issue is whether or not Principal Patak had actual notice of sexual harassment before my 12-year-old client was sexually abused. Now, I think that the term sexual harassment in the context of a school setting is really an unfortunate term. And that is because sexual harassment, as we typically use the term, is a workplace setting. And sexual harassment talks about unwelcome touching, unwelcome behavior. Let's just take the example of a man and a woman, with the man being a perpetrator, because that is what we have in this case. In the workplace setting, if a man was touching a woman, if he was hugging her, if he was rubbing her shoulders, that would be inappropriate, and we would call that sexual harassment. If it was welcomed by the woman, it would not be sexual harassment. Well, you know, fair hugs and shoulder rubs can be experienced as welcome affection or as unwelcome harassment. Is it your position that a woman should be allowed to touch a man? And that Principal Patak should have assumed that some student might experience this sort of physical contact as harassing, even if no student ever actually complained? Yes, well, Your Honor, in the context of a school setting, it is never welcomed. Welcomeness is not an issue for a little girl. Little girls cannot consent to being touched by a grown man. They are not old enough. And the courts are clear about this, that welcomeness is not a consideration when it comes to a school setting, which is why I say sexual harassment is really an unfortunate term in the context of a school setting, because all touching, all touching by a man of this nature, is unwelcome and inappropriate to a little girl. Can I just interrupt you to say, you said of this nature. Now, a standard that prohibits virtually any touching, you know, even giving somebody a hand to help them out of a bus, let's say, seems completely unrealistic to me. But what I think we need to focus on, everybody agrees in Gebser, the Supreme Court has said that this is not a vicarious liability situation. It's not a know or should have known situation. There has to be actual notice. But then, at least in the decisions of this court, the question then becomes actual notice of what? Is it a one free bite situation, where there actually has to be actual notice of rape, I'll say? Is it actual notice of inappropriate contact of some kind? You know, what is it that the actual notice has to focus on? Thank you, Your Honor. Let me address both of those questions. The first one being, are we saying all touching is inappropriate? Not at all. Not at all. This is not a case about saying a kindergarten kid falls down and a teacher picks him up. In fact, all the literature and the experts talk about, you should never have a no, flat out no touching policy. If it's a responsive touching, a kid's upset, you pat him on the back. A kid scores a touchdown, you hang him on the helmet. All that's fine. But that's not what this case is about. The touching in this case is a grown man going up to 11 and 12 year old girls, putting his arms around them in what we call a full frontal bear hug. That's not appropriate in any context. A full frontal bear hug means chest to chest, private area to private area. No man in a school should be... Can we see that in this record? I mean, I understood your brief to say that at least a rational jury could find the kind of behavior you're talking about took place. And I also would note that four different people, Warneke, McAuliffe, Gritt, and Widenvin, all expressed discomfort with what they're seeing. And these are trained teachers. So I wonder if you're drawing anything from that. Yes. Well, first of all, the term they used is the bear hug or the full frontal hug. Okay. This isn't the kind of hug where a person leans over and, you know, and pats someone on the back. A full frontal hug implies, and we have the video of the hugs that were representative of the types of hugs. The teachers testified that what was on that video, which was the bear hug, in essence, was representative of the types of hugs that Willie Collins was giving the girls on a regular basis. These are the full frontal hugs where the body is touching the body. We also have him coming from behind girls, putting his arms around them. In one of the videos, you see him grabbing, smacking a girl's butt. So these are all inappropriate. At the very minimum, it's a question of fact for the jury as to whether or not this becomes sexual misconduct. And I'd like to address your second question. Mr. Herman, before you move on, the videos that you're referring to, they are in evidence, but many of them we can't view because of the quality of the video. I don't know if that's something in transmission or if that's just the quality of the video that's in evidence. Do you have a particular video you can refer us to that depicts this? We did. The way the videos were sent to us, they're all kind of choppy, I have to admit. But we were able to pick out certain specific incidents that I'm describing where Willie Collins was going up and touching girls in a certain way. Can you identify those in the record by a particular frame or some way that we could go back and look? Because the videos that I tried to view were very difficult to view. If I could do that after. Please. You are welcome to file a supplemental letter after this argument responding to the judge's question. Thank you. And counsel, before we move on to the videos, I just have a question for clarification. It was my understanding that it was undisputed that Principal Patak didn't know about or hadn't viewed the videos and seen that conduct. Well, so the way, Principal Patak doesn't, there's not testimony that she watched these videos, but there's testimony. So the first school year where all this hugging is reported and the touching, the back rubbing is of 2012-2013 school year. And the evidence is, and the record shows, it was reported to Patak and she was aware of this hugging and this touching. When we, in discovery, the only videos we got were from the end of the 2013-14 school year, a 10-day period. We have testimony from the school that the hugging and the touching that's displayed in the video is representative of the same way Willie was touching the kids throughout the two school years. But the video, as you described it in your brief, I mean, the video shows more than that because it shows him touching the buttocks, it showed him touching the breasts, and there wasn't any of that sort of testimony about what was going on during those seventh grade years. Right. And I think it's important, the timing of those videos, because this follows after Patak already had notice of his inappropriate touching. So the extent that Patak was not aware of anything that might be additional things displayed in the video, as this court said in Hanser, citing to Gebser, liability should exist where the school district's own actions effectively caused the discrimination. So in other words, if Patak knew about all this touching was going on, leaving out the butt smacking, okay, if she knew about all that was going on, and she does nothing to interview the kids to make herself aware of what's going on as described open and notorious frequently in the hallways, then that's their own, they create their own issue. Well, she did speak to him one time, well, actually twice. So she spoke to him in April of 2013, and she said to him, you know, you've got to, you can't cross boundaries. Didn't she in that conversation also say don't meet privately with Doe? Yes. Implying that he had been? Yes. So she was aware he was taking out Jane Doe privately, and then here's where we get into the deliberate indifference, is that she did nothing after that. So she never actually follows up with the child. She doesn't send the child to the school counselor. She doesn't share this much with the child's parents. Never interviews the child, and never tells the parents, which under Title IX, it's accepted that young kids' parents need to know so they can monitor behavior in the future to make sure their kids are safe. But not only that, when the child moves on to eighth grade in the same school, Patak never tells her teachers about this issue with Collins, Willie Collins, of coming and seeing her. And throughout the school year, this testimony, Willie Collins comes to the class or brings her to the class late and is taking her out and being alone with her. And so to me, this Patak drops the ball completely, does nothing. And her response is, oh, that's Willie being Willie. So didn't she direct another teacher to speak with Doe's mother and to speak with Doe, and that teacher did, in fact, do so? Not about the issues of the touching in the school. There was an issue with, they found that Jane Doe had used Willie's name as her password, and that Jane Doe was cutting herself. And so they talked to Jane Doe's mother about some very specific things. They never told Jane Doe about the hugging and the kissing that was taking place. And the other behavior I want to talk about are the shoulder rubs. There's evidence in this case that Patak was aware that Willie Collins would approach Jane Doe and other girls, usually the same group of girls, in the lunchroom, he'd put his hands on her shoulders and he would massage them. Now, that's a very sensual act. I want to stop you there because there seems to be some dispute about whether Collins was engaging in exactly the same behaviors to boys and to girls, or whether the behavior vis-a-vis the girls is more intrusive, I'll just say, to use a word. And as I understand it, Doe's deposition indicates at least that it is a more intimate form of contact with girls? Yeah, there's no, in fact, in the videos of the 10 days, he doesn't hug one boy. One person said he also did something, or he hugged a boy or something. I think Judge Barrett pointed to maybe the potential problem with the videos, but apart from that, there's testimony, right, that girls were treated differently. Yes. There was a targeted group of girls, of which Jane Doe was part of, that the behavior was consistently about. And in fact, when Patak spoke with Collins, it wasn't about him hugging boys, it was about him hugging these girls, crossing boundaries with these girls. When Patak spoke with Willie Collins the following year during the Christmas time, and she talked to him about, he's still hugging, and his comment was, well, that's how I always am, it was about girls, it wasn't about the boys. So this is really a red herring, this whole thing with the boys, that he was somehow doing this to the boys. And again, I'm going to say it's a question of fact for the jury as to these particular facts. One of the things I think is really important to talk about is that we have this inappropriate touching, the bear hugs and the shoulder massages, which I contend is sexual harassment in and of itself. It's inappropriate touching. Now, we know now from the testimony that we alleged that the little girl was sexually abused the next year. About that question, Mr. Herman, do we know anything in the record about the outcome of the investigation of Collins and his employment status after those much more specific allegations were made? I know there was an investigation, it's not part of the record here, and I don't have exactly what would happen ultimately with Willie Collins. So there's no ultimate resolution at this point of those accusations. I know we're here on summary judgment, but... From a criminal aspect, correct. From the criminal case, I was involved in that. But what I want to talk about, though, is we have this notice behavior, which... And that's where, I mean, I really think we need to... One of the reasons this case is here in bank is because there are various formulations, both among the circuits and within the law of this circuit, about what does the notice have to be about? What does the notice have to alert the school of? And so, for example, our decision in 2008 in Hanson against Board of Trustees, within a couple of lines, says two different things. Says a plaintiff has to prove both actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and then that they didn't act on it. But then in the next breath it says, but you still have to have actual knowledge of misconduct that would create risks so great that they are almost certain to materialize if nothing is done. So certainly actual knowledge of misconduct is enough. Maybe at this very high level of risk inevitably leading to something, something along the lines almost of the Farmer against Brennan deliberate indifference, that might do. But we need to focus on this because it implicates the policy of Title IX, it implicates what does the Supreme Court mean in its cases here. So I would like you to tell me what standard you think this court should adopt. Thank you, Your Honor. I agree. In the three cases decided by this court, since Gebzer and Davis, Delgado, Hanson, and St. Francis, the standard is somewhat articulated a little differently. However, there are certain things that are true, that are common in all of these. And that is that in order to have Title IX liability, there has to be notice of misconduct to a school official, not just risk. So if someone says, oh, there is, we heard this guy, the teacher is having a relationship with a student, that's not enough. There has to be actual notice of misconduct. And your position is that the bear hugs, et cetera, et cetera, are the misconduct. We don't have to go all the way to whatever happened in eighth grade. Correct. And again, if this was in the workplace, this would be sexual harassment. School girls have the same right as adult women. Just because they're in school, we don't allow men to touch little girls inappropriately. The workplace standard is a severe or pervasive harassment to constitute a hostile work environment. Yeah. And if we had a serial harasser like Willie Collins in the workplace going up to women on a regular basis, hugging them and rubbing their shoulders, that would be severe and pervasive. We don't even need that in this case because it's an adult on a child. My point, though, is that this is misconduct. This is sexually inappropriate or sexual harassment in and of itself, the bear hugs and the shoulder rubs. Well, it's all very contextual, both in the workplace and in the Title IX school setting. And the severe or pervasive standard in the Title VII context has an objective component and a subjective component. Right. If that's the proper analog, how does this rise to that level? Right. I make the comparison only for the purposes to point out that this behavior is inappropriate. Is it the proper analog, though? I think that's what the judge is asking. No. Well, we have to ask ourselves, and I think it's a question, in fact, for the jury, as is misconduct. Now, Patak said it was. She said he's crossing boundaries. So the theory under Title IX, if you look at Gebser, for example, seems to be more in the discrimination branch of Title IX than the deprivation of access to programs branch. And the court says in Gebser itself a few times that if girls are being treated differently in this abusive sense, that's discrimination. And the law prohibits discrimination. The court says toward the end, no one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher. If the bear hugs and the back rubs or the shoulder rubs are considered such a harassment, and then the principal fails to stop just that behavior, the fact that Willie continued to give bear hugs to my client and shoulder rubs and forgetting about the sexual abuse, that in and of itself is actionable. It meets the standard of deliberate indifference because Patak didn't stop that behavior. So, Mr. Herman, with regard to the standard you're articulating, notice of misconduct, not just risk, in your response to Chief Judge Wood's question, that means that's what was above the should-have-known standard of Gebser? Correct. Correct. She knew about this misconduct. We're not saying this is vicarious liability. Clearly, in Title IX, the school official has to know about misconduct, sexual harassment taking place. Mr. Herman, let me ask you a question on that point. You're merging misconduct with sexual harassment. Let me ask you about a different fact pattern altogether. Suppose a parent brings to the attention of a principal a series of text messages that her daughter was receiving that don't have any sexual content to them, but do reflect some infatuation and also reflect the teacher arranging to go to a movie alone with a student on Saturday night. I think everyone would say that is clearly misconduct. May not be sexual harassment. Correct. How does that fact pattern come out under your standard? Right. I agree with that. In this case, what we have is the actual, when I say misconduct, the sexual misconduct, I'm talking about the touching. Now, there are behaviors that can be considered. You've also, when you first started, you said that that conduct has to constitute sexual harassment. Yes. That's the point I want to push on. Yes. When I talk of misconduct, thank you, I'm talking about misconduct that is characterized as sexual harassment. Okay. What about the text messages? That's not sexual harassment. That would not be considered, I don't think, sufficient under Title IX to put a school official on notice because that's talking about a risk. As this court has said before, that's not enough. There has to be notice to the school official of actual sexual harassment. In this context, there was the notice. There was the physical touching. There were some behaviors. Is it your position, counsel, that the shoulder rubs were actionable standing alone? Yes. Yes, Amanda. Any one of those students who was the recipient of a shoulder rub by this teacher, I'm sorry, security guard, could have filed suit? No, only if it continued on them. At that moment? And her teacher or her adult is coming up every day and putting his arms on her body and rubbing her shoulders, and the principal is reported, and the principal doesn't take action to stop that? Yes. That's inappropriate behavior. And that's why I say this question... Well, it may be inappropriate behavior, but it's actionable discrimination. That's what the statute requires, and that's what the Supreme Court's cases require. The Getser Standard is actual notice of discrimination in the grant recipient's program. Yes. So a shoulder rub is an act of discrimination. Okay, so if you isolate just a shoulder rub... Two shoulder rubs. Well, that's the slip. I mean, that's the continuum. At that point, it becomes a question of fact. That's why we're asking about the standard. Right. So the standard... That's why it has to be severe or pervasive. According to Davis, at least when we're talking about student-on-student sexual harassment, but why shouldn't that be the standard for teacher-on-student? Because Supreme Court said it's not. Supreme Court in Getser said... Supreme Court has never said it's not. Well, Supreme Court said in Getser, they set out the standard for a teacher-on-student, and there was no pervasiveness requirement. It was only in Davis, and it's very clear in the discussion, in the opinion in Davis, that it's talking about adding this pervasiveness to student-on-student because kids will be kids. There's all sorts of bullying and name-calling that takes place with students, and the Supreme Court said we're not going to hold school districts liable for typical kid behavior unless it is so pervasive and severe that it deprives a student of an educational opportunity. There are circuits around the country that have made that clear. Eleventh Circuit has clearly set out and distinguished that the pervasiveness standard only applies in student-on-student, does not apply in a teacher-on-student case. Tom, I want to... Oh, sorry. Please finish. So I'd like to just... Well, what is the standard if it's not severe or pervasive? It is... How do we instruct the jury? You want your case to go to the jury. How do we instruct the jury on what constitutes discrimination in the grant recipient's program? Right. So it's whether or not there was notice of sexual harassment. Now, what sexual harassment is is a question of fact. You need to give the jury a legal definition. How would you write your jury instruction? If you go back to the district court, what kind of jury instruction are you going to submit to the district judge? If the court would let me write the jury instruction on this, what I would say is that it is a touching of this... If the man, if the adult has touched the child in a way that has... You don't know what the standard is. It's worse than look at Davis itself, where the court says the relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach. And here's the critical thing. Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. So you're going to describe something that interferes with the access to education. Right, but you don't have the requirement to show a pervasive... And that's where the court is distinguishing the teacher case from the peer case. I'd like to go back to... You should answer the judge's question. If you want to save rebuttal time, you should think about that. Okay. So I'd like to answer your question about... We're talking about the back rubbing, whether or not that back rub and how many do you need. At a certain point in this case, we have what we call a serial harasser. I believe the evidence shows that. And this court has talked about where you have a serial harasser. That may be enough to establish the notice and the liability. In this case, it wasn't one or two shoulder rubs. It was ongoing shoulder rubs and bear hugs. And so I think at a minimum, it then is a question, in fact, for the jury as to whether or not that constitutes sexual harassment. And that's your question on the jury instruction. It's whether or not the child is being discriminated against in education because of her gender. Counsel? There's a question from Judge Hamilton. If we disagree with you about whether anything that happened in Doe's seventh grade year was sexual harassment, do you lose? Do I? I'm sorry. Lose. Do I lose? Yes. Okay. That helps clarify things. Thank you. Okay. Thank you. I reserve the five minutes. I have one other question. You keep talking about bear hugs and hugs. Give me the train between a regular hug and a bear hug. Yes. So there are certain different types of hugs. There's actually testimony in the record about this, right? You know, going around somebody's shoulder versus full frontal. Right. In fact, he was disciplined. Collins was told, or the standard is that they allowed a side hug. So if a student, for some purpose, Willie Collins was going to hug a student, it should be from the side. But the evidence is that he didn't do that. He did the bear hug. The bear hug is when your arms go all the way around someone and you pull them to your body. So your body is touching. And that's why I say it is a natural consequence of a bear hug that his private area and her private area are pushing against each other and are making contact. Her chest would be making contact with him. That type of hug. But there can be hugs short of that that are all right. But that's not the evidence in this case. No. Absolutely could be different. Yeah. There could be hugs that are short of that that are okay. That would not constitute discrimination or sexual harassment. So we get down to a fact of whether or not it was a, quote, bear hug or just a standard bear hug. Yeah. We get down to a fact finding. Exactly. Thank you.  Thank you, Mr. Herman. Suzanne Horne. May it please the Court. The first thing I really want to say is that I think that the description of the conduct as bear hugs, the testimony is almost 90-plus percent all of the witnesses testified that almost all of the conduct was kids coming up to Mr. Collins and hugging him. There are a number of the teachers testified they never saw Collins initiate a hug with a student. It was always the students coming up to him. Was there ever an attempt by school personnel to discuss Mr. Collins' behavior, the hugging, the shoulder rubs, with students to see whether any of them were troubled by this sort of physical interaction? To my knowledge, no. There was no – Collins' conduct was never really brought to the attention of the administration. These events in the April of 2013 year, that all came up because it started with Brooke Gritt, who was a teacher, who some of Doe's friends came up to her and told her that Jane Doe was cutting. So Gritt goes to talk to Doe and asks her, you know, what's going on? And Doe said, a family friend has died. And then Gritt said, well, do you have someone to talk to? And then Doe said, yes, I talked to Willie Collins. And then a while, like a month later, Gritt gets an email from Mother Doe saying, we're having some problems at home with Doe. She ran off. She erased herself on her iPod. And at this point, and this is in the emails between Doe, between Gritt and Mother Doe. And then at this point, Gritt says, well, I talked to her a month ago, and this is, you know, and she told me she's talking to Willie Collins and that a family friend died. And this all sort of brought up this issue that Doe is having problems. And so this is what led Gritt to talk to McAuliffe, which then talked to Patak. So these are the sort of the concern about Doe is what brought all of this to Patak, not Collins' conduct. But let me say, I mean, it's striking to me at a minimum that so many people from the school, beginning with Tracy Warnecke, and then as you are pointing out, McAuliffe and Gritt, maybe also the school psychologist, but at least Warnecke, McAuliffe, and Gritt, they're sensing a problem with this relationship. And I'm quite reluctant to put this at the feet of a 12-year-old, because they're not, they're 12. I mean, they don't have any brains, right? You know, they, right? I hadn't had enough of them myself to know that. And so when these adults who were responsible for drawing these distinctions between, you know, the appropriate hug and the inappropriate hug or the too much touching with the rubs, you know, go to Patak, Patak knows that potentially troublesome physical contact is happening. We can all agree she at least has actual knowledge of that. Whether that's actual knowledge of enough is one of the reasons we're sitting here, to decide whether that's the case. But clearly, these are trained teachers, and they are passing along serious concerns to the principal. It certainly isn't Jane Doe. I agree that it's not on Jane Doe. The response, though, was... The district court kept saying, oh, it was Jane Doe who initiated this. I was very troubled by that, actually. But I think that the issue is, what does the school district know about Collins' conduct of sexual harassment? And it wasn't just, I mean, Doe was, I think it's clear Doe had a crush on Willie Collins. And that's what led Patak to tell Collins, back off, you know, let's pull back on the boundary issue. I mean, why don't you intervene with Doe? Why don't you intervene with the child? What was done then is that Patak told McAuliffe to talk to the mom. She talked to the mom, and the mom said she was going to get Doe into counseling, and she did get Doe into counseling. And Doe's first counseling record, first record with this psychologist is part of the record here. And in that record, it was mentioned that she had connection to a hall monitor. That's how Collins is referred to in that record. But the issues that were discussed in the counseling were related to kind of typical teenage issues. So the school district didn't just ignore it. Patak had McAuliffe talk to the mom. The mom got her into counseling. So they weren't ignoring the fact that there was an issue going on with Doe here, because that is what brought everything. It was Doe's conduct that was brought to the attention of Patak, not necessarily Willie's conduct. But Willie's welcoming this conduct. I'm imagining situations where, you know, maybe some very charismatic teacher or hall monitor or whatever the position is, adult, working at the school, makes himself available to infatuated young girls. Well, that's not right. You know, that is a form of inappropriate sexual behavior that interferes with the girl's education. We have evidence in the record that Doe comes to class late, that Doe is missing classes, that she's cutting herself, that she's doing very troublesome things. During the seventh grade school year, there's not evidence in the record at that point that she's missing classes. That happens during the eighth grade year. But obviously it's Doe's issues that came to the attention. But she is cutting. She is definitely cutting, yes. But, you know, the question is, is this conduct that everybody, that Patak is aware of, which is the hugs that are mostly, you know, and not just Doe, it's all of these kids. So does Patak not worry about grooming behaviors? What her response to that question in her deposition was that, I know about grooming behaviors, but it's not on the forefront of my mind, that the same behaviors that we call grooming are also behaviors that can be considered mentoring and helpful relationship for kids. Some of the kids enjoy the connection. Patak gave the example of a kid who comes in every day, the first thing he does, he walks in and gives her a hug. Some kids, that's helpful to them. But, Ms. Benton, factual interpretations are questions for the jury. And what we're here today about is the proper legal standard because our cases don't make that clear and neither do the Supreme Court. So if you would address yourself to the appropriate statement of the legal standard, and I'd like to ask you the same question that I asked your opponent, which is how would you write a jury instruction? The legal standard, I believe, is actual notice of discrimination in its programs. And how do you define discrimination? We have a definition in the Title VII context. What I found most helpful in that regard was the Office of Civil Rights, their guidelines for sexual harassment, and they give a definition that's used in the administrative. And in Gebser, they talk about the fact that the judicial remedy and the judicial implied cause of action here shouldn't be broader than the legislative and administrative. And the OCR revised defines it as conduct of a sexual nature that is sufficiently severe, persistent, or pervasive, that it affects adversely a student's ability to participate in or benefit from the school's program. Okay, so is that the legal standard we should be using to evaluate whether the record is sufficient to give it to a jury? I think that is the standard, and that comes from the OCR, but it also, if you look at the Davis case, and I know the Davis case involves student on student, but there's a lot of language there that is broader than just student on student. And the Davis case specifically talks about the fact that discrimination under educational program, that that envisions that the conduct be sufficiently severe, pervasive, so as to deprive the victim. Those are in the alternative in the Title VII areas. The conjunction is or, severe or pervasive. So even if the hugs weren't severe, if they're pervasive enough, if we had a Title VII case at least, that would be enough. And I think the or applies here as well. But there's another qualifier. It has to be conduct of a sexual nature. Conduct of a sexual nature, and that's where I think in this case, you know, the hugs, the shoulder rubs, there's, I don't, Patak did not think it was sexual. And all of the teachers, even the ones that felt it was inappropriate, none of them, they all testified, they did not think of this as sexual or sexual harassment. But, you know, when we're talking about children, isn't it irrational to make the school's obligation determine whether a student has consented to an adult employee's physical contact or has objected to it? I mean, isn't it possible one or more students found Mr. Collins' bare hugs and shoulder rubs to be intrusive or uncomfortable but didn't realize they had a right to object to such contact? The idea of welcomeness is obviously not something that can be factored in. It's not something that can be factored in. But the definition of sexual harassment doesn't, as I have defined it, doesn't include that concept. Why doesn't it at least include different behavior based on sex? Boys and girls, the easy definition of sex. And if this record could be understood to show different behavior to boys and girls, don't we need a trier of fact to resolve that? And if the trier of fact said, you know, Mr. Collins was the same to everybody, there'd be no case. But if he was exclusively behaving in this physically intimate way with the girls, even though we as adults might not see that as particularly sexualized, it is if it's only the girls. The record is that it wasn't limited to the girls, though. But there are other parts of the record that show that it is different for the girls. Not different. Yeah. Who was he giving the frontal hugs to? There's testimony in the record that says the behavior is different to the girls. The district court didn't report it that way, but the district court missed this evidence. Again, the fact that it's girls that are primarily going up to Mr. Collins and hugging him, I don't think... At least in one instance, kissing him. And that was just Jane Doe on one occasion, right? That... I don't think that when the kids... And it's different than welcoming. In my mind, welcoming is Mr. Collins going up to a kid and, you know, over and over, initiating, initiating. And that's sort of in the Delgado case. It was an older adult college, but it was the perpetrator, so to speak, initiating conduct and conduct. But that's not... Can I explore that for a minute? Because I seem to remember cases in... These tend to be in the high school setting, not in the middle school setting, where, you know, there's a young, very attractive, you know, physics teacher or football coach or something. And because they're immature, there are some girls who are throwing themselves at him. And what's he supposed to do? Does he say, oh, you know, I've hit the jackpot, I'm going to welcome this? Or does he have the obligation to prevent that behavior? If it's sexual, he has an obligation to prevent it. Yeah, that's what I'm saying. I can think of cases. Absolutely. The fact that they're initiating sexual conduct. But I think classifying even a bear hug that's by a child of an adult, I don't think you can... We can say that that's sexual. Well, some hugs would be and others wouldn't. I don't know if this is a Potter Stewart moment, you know, but they could be. And I agree they could be. But I don't... I don't think that Patak had any knowledge or even, like, anybody suggested to her that this conduct was sexual in nature. And why did she talk to him? She talked to him because Doe was having these problems. And there was the issue that Doe had an infatuation, a crush on Collins. Why did she tell him to change his behavior? To prevent, to try to help not encourage Doe, I think, to try to stop that conduct. Did Principal Patak take any deliberate actions to avoid learning about the misconduct or avoid learning about a relationship between Collins and Doe? No, not... I think she was open to if people were going to... Ms. Van Horn, can I ask you a similar question I did your adversary about a principal learning of a rampant text messaging campaign? And you look at it and you say, I don't know that I could call it sexual harassment because there's no images or, you know, anything that is, you know, sexually inappropriate in the content of the message. But, boy, the writing is on the wall here where the teacher expressly in the text messaging is arranging to meet a kid at a movie on Saturday night one-on-one. Is that, and the principal has seen it all. Where does that fall under the standards that you have in mind? Because I react to that by saying, just as I did, the writing is on the wall. And I think if the principal finds out about these text messages... They have them, they have a copy of them. I think that an adult wanting to go to a movie with a child is not sexual conduct, or I think it is... It may not be sexual harassment, but everyone would agree that it's misconduct. And it's misconduct, as I framed the hypothetical, that is at a very high risk point. Why is that not enough to state a claim? I think that that text message could potentially be considered sexual conduct. Ms. Van Horn, how does that differ from should have known then? This fact situation of the text message of an adult wanting to go to a movie with a child, that... Well, it's actual knowledge, at least of that much. Yeah, and I think... It's not a prediction. This is where the obvious term comes into some of the earlier... Right. A prediction that things will go badly from there. But I think the risk, the concept of a risk of an outcome almost certainly likely to occur is present in that situation. The should have known, I think this fact situation kind of goes a little beyond... I think it's more of a sexual conduct than the should have known. In my situation, the should have known is sort of what we have here. What we have here is that in retrospect, at the time this is happening, the concern is Doe's cutting. But there's not a concern about Colin's conduct other than the fact that Doe has a crush on him and Patak wants to address that to help Doe. So does the misconduct itself have to be sexual in nature? I believe it does. I believe that the actual notice of discrimination in programs, the notice standard, I believe it does. What about Judge Sutter's example where the misconduct may not be sexual in nature but certainly poses a substantial risk of sexual misconduct? Is that sufficient? I just think that a text between an adult and a child, if that was text in a college setting, I think it probably, again, you have to look at the constellation of the facts. I'm getting more and more puzzled about the attention to what a teacher did or what Collins did. If I understand Gebster correctly, Gebster said the school district is not liable for the performance of a teacher or for the performance of an employee. It's only liable for the behavior of the supervisor, which is why, of course, the focus had been, in this case, on the performance of Patak. The question, therefore, it seems to me, is not what Collins did as if his behavior were imputed to the school district, but what Patak did. Shouldn't we be discussing what she knew and what she did? That is actual knowledge by Patak in this situation. She had knowledge of hugs. She had knowledge that on one occasion Doe kissed Collins on the cheek and that thereafter Collins rebuffed her. Then what did she do? What of that is contested and what is uncontested? It's uncontested that she then sat down with Collins and talked to him about these boundary issues. She told him to be careful of boundary issues, to talk to Doe in public, not private places, because part of Collins' duties, even though he was a security guard, was to have this mentoring role of working with kids. It wasn't unexpected that he was going to be having connections with kids, and particularly kids who were having problems. Patak, knowing that, talked to Collins and asked him to tone back that behavior and meet in public. Then in December of that year, it appears that that was more in passing, she just reminded him again of the boundary issues. What does the record show about what happened, or perhaps more accurately in light of Gebzer, what she knew about what happened? It was her understanding. Based on her observations, she saw that there was less contact between Doe and Collins. There was an issue had been brought to her about Collins appearing at a tennis meet, and she had followed up with McAuliffe to find out if Brookgrit, was there anything that Patak should know about that? Was there anything unusual, and McAuliffe never came back to her, so Patak, again, had no information. You used the phrase, less contact. Do you think that's adequate, given what Gebzer said? If the principal says this is inappropriate behavior, it must stop, and the principal knows it doesn't stop, what follows? I don't think that Patak thought the behavior was misconduct. I'm trying to be careful about how I'm phrasing this, because I'm not asking what you think. I'm asking what inferences the record would permit to be drawn in favor of the plaintiff, and on what questions there is no disputed issue of material fact. So, Patak did not know that the conduct involving Collins was sexual. She put the restrictions that it was sexual discrimination. She asked him to watch boundaries and back off on his conduct, to help Doe. But wouldn't the record support an inference that when these school personnel come to her with their own concerns, that there's something amiss about this relationship? I'll be vague. She doesn't say, oh, come on, this is just natural and appropriate behavior. Put your mind at ease. I'm not going to do anything. She follows up. And so, presumably, she follows up because she sees a risk that there is something inappropriate going on. Does it have to be a substantial risk? It has to be a substantial risk. It has to be sexual harassment that deprives Doe of the victim. Here, Doe is the only one that… What did she mean when she said he's a coach? He coached a lot of the different basketball, baseball, those types of teams. Boys and girls. Boys and girls. And he was also in charge of… At the high school, they had conditioning, which Doe attended. It was for all different grades, but Doe attended the conditioning class that Collins had as well. The requirement was she do something. She did something. It doesn't have to be effective. She did something. And her knowledge… It wasn't the fact she did nothing when she heard… That's absolutely correct. And not only did she do something, the information she had after that led her to believe that there was no issue anymore. Counsel, do you agree that the standard for actual knowledge encompasses recklessness? Like, obvious… I mean, this would be Judge Scudder's hypothetical to use. Some of our cases phrased it as a risk that means it's almost certain… That the sexual misconduct is almost certain to materialize if nothing is done. It seems like one question here is whether these shoulder rubs and hugs that Patak knew about gave her that kind of knowledge so that she should have seen that it was almost certainly to happen, and that he was going to wind up actually sexually touching her in ways that we're going to say explicitly sexual, as he did. And the other way they can win, which seems to me how Planoff is taking his case, is to kind of cut out what happened in eighth grade and to say that she knew about the shoulder hugs and that was misconduct. So if we take the first route, how would you articulate the standard for actual knowledge? As I see it, the standard for actual knowledge is actual knowledge of conduct of a sexual nature that is pervasive, severe, or… No, no, no, you're talking about the second route. I'm talking about the first route. What is actual knowledge? Because if we say, listen, she thought something was amiss, as Judge Wood is saying, so she talked to him because she thought this was risky behavior that might pose a risk. What is the standard for actual knowledge? Would it include an obviousness that this is going to end badly? Under Title IX, I think not. I see Title IX as requiring actual knowledge of discrimination. Okay, so what if she overhears a conversation between Collins and another teacher in the staff room in which he says, I am going to try to have sex with Doe tonight. So it's not misconduct because he hasn't said that to Doe and he hasn't done anything to Doe, but that's an obvious risk. Would that be… If she doesn't do anything about it, she doesn't talk to Collins, she doesn't try to stop the encounter, but she doesn't have actual knowledge of misconduct because it's yet to happen. Is that actionable if she doesn't stop and it goes forward and he rapes her? She has actual knowledge of sexual conduct. I mean, it hasn't occurred yet, but it's actual knowledge of sexual conduct. It's not a, it might happen or it's not. So I think that that would satisfy the standard. I don't… It's actual knowledge of discriminatory conditions in the program. Correct. Which is what the statute requires and what Gebster requires. Risk analysis really has no place in this context and I know our cases talk about that, but the Supreme Court's cases discuss this as sort of a contract-based analysis that what the statute is, is a spending clause statute that creates a contract between the federal government and the recipient of the program funds from the federal government to maintain a nondiscrimination norm in the administration of those funds at the programmatic level. So the kind of situation that's just been described of actual notice of a discriminatory condition in the program that a teacher is about to have sex with a student requires a response, otherwise there's deliberate indifference. But we're talking not about tort analogies. Risk analysis is all about torts. And the analogy to constitutional torts, I know that's in the Supreme Court's cases too and that's confusing because risk analysis has a bearing on the constitutional tort of deliberate indifference. But it really doesn't, as I read the Supreme Court's cases, I don't see Gebster as adopting deliberate indifference in the tort context, but really more as a way of measuring the district's response to the discriminatory condition. That's how I see it as actual knowledge as one and then deliberate indifference is the response that the school district takes to whatever knowledge. So does risk analysis have any place here? Not on the actual notice element. So it's not notice of a risk, substantial or otherwise. It's notice of actual discrimination in the program. Discrimination, you said, can be planned. It doesn't have to have happened yet. Well, yeah, and I think I might have misspoken on that. I think that under the Title IX... You probably have some criminal law duties that kick in at that point, right? Right. Regardless of what Title IX might say. Can I just ask you the same question I asked earlier? What do we know about the outcome of the investigation, Mr. Conrad, and his employment status? Yeah, the record, it's Record 32, Part 10. The district attorney declined to charge him, and he is back at the school district. I'm sorry, I didn't hear the last part of what you said. And he's back. He works at the school district, at the high school. Thank you. Doing the same job. He is a security officer at the high school, not the middle school. With the same responsibilities, coach, mentor? I don't know about the coaching aspect. His security guard duties are the same. Mentoring? To my knowledge, it's not in the record. I think we're going a little... I think I can't say that one way or the other. I only want to say one thing, one question, and that is with the people of Warnakey, Grit, and McAuliffe. As I understand it, they did get together and have a discussion about Collins and the relationship with Dole. And they assessed what was going on and did draw some conclusions about what's going on. And actually dealing with it. They have titles like counselor and social worker, and what's another one? Positive behavior support coach. They do things what they did. They didn't involve PTAC. But they did deal with it. Isn't that correct? Yes. And these pupil service meetings, their talking is what led PTAC to talk to Dole. Not to Dole. I'm sorry, to talk to Collins. Correct. And then to have PTAC told McAuliffe to talk to Dole's mother. But it was these pupil service, them all talking, that then was relayed to PTAC. Not about that it was inappropriate, but that Dole was having problems. That's how I understood the discussion between Warnakey and... That's why they got together, because Dole was having problems. And they discussed these people that I mentioned. And then, I think I'm not pronouncing your name, but PTAC was brought in. Right. And then she spoke to him. All right. Thank you very much, Ms. Van Horn. Mr. Herman. I want to address a couple of questions that were raised. Specifically, this example of non-sexual conduct leading to discrimination. And the OCR actually addresses this. The Department of Education, in information to the school district, says, Title IX's prohibition against sexual harassment does not extend to legitimate non-sexual touching or other non-sexual conduct. But, in some circumstances, non-sexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Counsel, I have the same concern that I expressed for Ms. Van Horn's argument. Gebser expressly holds that the school district is not vicariously liable for the behavior of the teacher. Collins' behavior is not the question here. The question is what PTAC knew and did. Yes. I would appreciate it if you would focus on that. Yeah. And that's, if I could finish reading this, this is exactly what PTAC knew. So, early signs of inappropriate behavior with a child can be the key to identifying preventing sexual abuse by school personnel. So, let's talk about, and then PTAC acted by, among other things, telling Collins not to initiate any touching, not to be in private with Donald, right? So, the question I ask to Ms. Van Horn is, what could a reasonable jury infer about what PTAC knew about what then happened? Okay. So, the first step, and if you're, and the point is that what PTAC knew. So, after the April conversation. Yes. I think that's what judges, that's what you're getting at? Yeah, yeah. So, we're getting to what the remedial measure would be then, and what she did and what did she know. So, all she did essentially was have that meeting. After that meeting, we know in May, PTAC was told by other teachers that Willie Collins was hugging students, was acting inappropriately, was engaging in physical misconduct. So, PTAC knew that, and that's from the testimony, that's from the record. The record says PTAC did nothing. After learning that, the remedial measure she took in speaking at Collins in April was not working. We also know that following the next year, PTAC was told that Willie Collins was still engaging in this inappropriate, you can call it non-sexual conduct that takes on a sexual connotation, or called sexual harassment. But we know that PTAC knew that in Christmas of the following year. And the only recourse, the only thing she did is that she said, Willie, you're still doing this. And Willie said, yeah, I always do that. I'm not doing anything I haven't always done. Is there any evidence that she knew he was taking any of these actions toward Doe at that time, or was it all other students? Yeah, there's no evidence that it was specifically Doe. It's just that he was continuing as the serial harasser of other students. How would that matter in the analysis? Well, it doesn't matter whether it was directed to Doe or not. It's that PTAC knew he was still engaging in this sexual harassment or this discriminatory behavior towards girls. And also notably, PTAC essentially stuck her head in the sand and didn't inquire about Doe. We know because Willie Collins was still taking Doe out of class in eighth grade, and she was all sorts of... Is there evidence that PTAC knew that? No, she didn't know it because she didn't ask. And at this point, she has a duty under Title IX... You're making an ostrich argument, so to speak? Well, under Title IX, since she already has notice of the inappropriate behavior, she has a duty to ensure that remedial measures are working. And there's certain things that she's supposed to do. When do you think the Department of Education could have cut off federal funds to the Madison School District based on this? Well, when there was notice that the remedial measures were not working, starting in May. So I would say May... May of 2013? Yeah. They could have... That the bear hugs and the shoulder rubs would justify a cutoff of federal funds? I think... I don't think they cut off federal funds practically... That's the standard, isn't it? Well, it's the stick, and it's the... Is there a different standard for the private implied right of action? No. As a practical matter, there is. We don't see... But you said there would be a higher standard for a private right of action than for a funds cutoff. As a practical matter... No, look, I'm talking about the holding of the Supreme Court. It said there's a higher standard for a private action than for a funds cutoff. So when you answer Judge Hamilton by saying these events would not have justified a funds cutoff, how can they support it? That wasn't my answer, Your Honor. My answer wasn't they don't justify it. My answer was, as a practical matter, that doesn't happen. I've handled a dozen Title IX cases. I've never seen the Department of Education cut off federal funding when there's notice like this. But as a matter of... If your question is, when did they have the right to do it? I stick with my answer, which would have been May, when she found out that the discriminatory behavior was continuing. That this serial harasser was continuing. But not as to Doe, though. As to the other females in the school. We're talking about Doe, right? No, the question was, when would the Department of Education have the right to cut off federal funding? And my answer is... My question to you is, when did she discover it wasn't working as to Doe? It never was that. I'm sorry? As far as she knew, it worked as to Doe. Well, as far as she knew, she didn't ask about Doe. She never questioned Doe. It never stopped, and it only got worse. No, from anybody. It wasn't working as to Doe. But the school official can't put her head in the sand and not find out. She can't... When, on your put-his-head-in-the-sand approach, when can you point us to when you believe the substantial risk of misconduct occurred? Right. I don't want a continuum. I want where a reasonable jury would say, at this point, Patak knew a substantial risk. Right, and that's why I was going to finish at that point, which is, I think the test should be substantial risk. And the test should be when a school official has notice of sexual harassment that there is... Potential sexual harassment. Maybe we should say potential sexual harassment, because some of these vignettes that have been played out here didn't really reach that, whether it's a text message or otherwise. But in this case... In this case, right. In this case, on this continuum, the standard is that there's deliberate indifference when the remedial measure is clearly unreasonable in light of the known circumstances. So it's a fact-finding question. So we have to... But in... Yeah. So when did it occur here? Right. So in this case, when Patak knew the remedial measure wasn't working, he was continuing to hug and to engage in this behavior. Now, if Patak had investigated further or had told the parents and they would have monitored it, she would have also found out that in the beginning of the next school year, the behavior was continuing. So at that time, I believe the jury can make a finding that there was a substantial risk because the remedial measure was not working and the behavior was continuing. So is the date April? Is it May? I don't know I can give you a specific date. Certainly it's not April. I can say after April, when the remedial measure is not working, and she's told in May, he's still hugging. And she's told the following year, she's still hugging. Now, I add this other element, which is that I think she has a duty to see if it's working. We know from the video evidence that... And there's testimony that the behaviors in the video are representative of the kind of hugging that he did throughout the two-year program... Out the two years. That behavior in the video, which I will get broken down, shows in a 10-day period repeated open and notorious inappropriate hugging. So, yes, so her remedial measure were not working and they were clearly unreasonable in light of the known circumstances, which is a serial harasser really running around hugging girls inappropriately. I don't mean to belabor this because you're well into your past year light time, but I understood your opening argument to say that actual knowledge of conduct that constitutes discriminatory sexual harassment was required. And now you're saying no, actual knowledge of conduct that creates a risk of discriminatory sexual harassment is sufficient. I'm just trying to button down what you're arguing. Sure, that's not what I intended to say if I said that. You just did. Okay, so what I'm talking, you have two elements here. The first element is the notice. And what I said is the law says that there has to be notice of actual sexual harassment or discriminatory behavior that goes to the school official. Okay, so you're withdrawing your risk. The substantial notice of conduct creating a risk is insufficient. You're saying that's not... Well, here's where the risk question comes in. When you're looking at the remedial measure, the law says that there's deliberate indifference where the remedial measure is clearly unreasonable in light of the known circumstances. And that's where the courts talk about the substantial risk. They're saying, look, if you have this discriminatory behavior that you have actual knowledge about and your remedial measure is to just say don't do this again, then you've created substantial risk that this is going to continue and that there's a substantial risk that this behavior will continue or turn into even sexual abuse. That's how the courts have used the term substantial risk. So it has to be successful. No, it doesn't have to be successful. It has to be clearly reasonable. I would say that Judge Scudder's hypothetical that the actual knowledge would be of the text and the plan for the tryst. But I think that would be enough. Well, an extreme example of those texts where they're going to have sex... There's a lot of texting that's going on. I don't know why you call it extreme. Well, where they had actual knowledge that the text said we're going to go on a date. I think that would be non-sexual conduct that takes on a sexual connotation. And there would, I think, in that case, be a duty to investigate and see. I don't know. I mean, it's not the facts of this case, so I'd have to analyze a little more. But I can see the argument that certainly there's actual notice of that text that's inappropriate. And asking a child on a date does take on a sexual connotation. That may be discriminatory. Okay. I think unless any of my colleagues have any other questions, we need to wrap this up. Can I just finish with... Well, I'm sorry. I think you... We have your point. Okay. Thank you. Thank you very much. Thanks as well to Ms. Van Horn. The court will take the case under advisement. We will be in recess.